NATIONAL WILDLIFE FEDERATION,
et al., Plaintiffs,

v.

Colonel Wayne A. HANSON, et
al., Defendants.

No. 83–1288–CIV–5.

United States District Court,
E.D. North Carolina,
Raleigh Division.

Dec. 20, 1985.

Katherine P. Ransel, Nicholas C. Yost,
Center for Law in the Public Interest,

Washington, D.C., Derb S. Carter, Jr., Raleigh, N.C., for National Wildlife Fed. et al.

S. Henri Johnson, New Bern, N.C., for N.C. Fisheries Ass'n, Inc.

Suellen T. Keiner, Washington, D.C., for E.P.I.

W.B. Carter, Jr., Carter, Archie & Hassell, Washington, N.C., for Prulean Farms.

W.B. Carter, Jr., Carter, Archie & Hassell, Washington, N.C., Daniel K. Mayers, Andrea Timko Sallet, Wilmer, Cutler & Pickering, Washington, D.C., for Peat Methanol Associates.

H. Robert Showers, Asst. U.S. Atty., Raleigh, N.C., and Jean A. Kingrey, Special Litigation Counsel, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., for defendants Hanson, Marsh, Gianelli, Bratton, Ruckelshaus and Jeter.

## MEMORANDUM OPINION

BRITT, Chief Judge.

This action was brought under § 505 (citizens' suit provision) of the Clean Water Act (CWA) to challenge a determination by the United States Army Corps of Engineers (Corps) that a particular tract of land in eastern North Carolina was not a "wetland" under § 404 of the CWA and, therefore, not subject to the regulatory authority of the Corps. 33 U.S.C. § 1365 and § 1344. Plaintiffs are National Wildlife Federation, Environmental Policy Institute, North Carolina Wildlife Federation, Pungo River Association, Stumpy Point Civic Club, the Pamlico-Tar River Foundation, Conservation Council of North Carolina, Inc., and North Carolina Fisheries Association, Inc. Defendants are Colonel Wayne A. Hanson, in his official capacity as Wilmington District Engineer; John O. Marsh, in his official capacity as Secretary of the United States Department of the Army;

William R. Gianelli, in his official capacity as Assistant Secretary of the United States Department of the Army; Lieutenant General Joseph K. Bratton, in his official capacity as the Chief of Engineers of the United States Army Corps of Engineers; William D. Ruckelshaus, in his official capacity as Administrator of the United States Environmental Protection Agency; and Charles R. Jeter, in his official capacity as Regional Administrator of the United States Environmental Protection Agency (federal defendants). First Colony Farms, Inc. (FCF), the owner of the land in question, and Peat Methanol Associates (PMA), having an interest in developing it, were allowed to intervene as defendants (private defendants). Currently before the court are motions for summary judgment filed by plaintiffs and the federal and private defendants. Oral argument having been held, they are now ripe for disposition.

## I—FACTS AND PRIOR PROCEEDINGS

The allegations of Count I of the amended complaint concern a tract of land containing approximately 32,750 acres located in Tyrell, Hyde and Washington Counties in North Carolina (Tract I).[1] Tract I is a part of a large expanse of land lying in a peninsula formed by Albemarle Sound, Pamlico Sound and the Alligator River. These large sounds—bodies of water separated from the Atlantic Ocean by the thin finger of land known as North Carolina's famous "Outer Banks"—provide drainage for Tract I and other similar lands in the eastern part of the state.

Tract I itself lies south of Phelps Lake and east of New Lake. Historically, the area was considered a forested swamp, useful solely for timber production. Periodic efforts have been made over the years—beginning as early as 1787—to utilize the property for other purposes, such as cattle and row-crop farming. These ef-

---

1. This action originally involved two tracts of land in eastern North Carolina, referred to as Tract I and Tract II in the amended complaint.

The allegations concerning Tract II, which were the subject of Count II, were disposed of by a consent decree entered on 19 March 1984.

forts have centered around the use of drainage canals to lower the natural water table. New Lake Canal and Pungo Lake Canal were completed in 1843, but most of the canals now in place were apparently constructed after 1970. Just how successful these previous farming ventures were is uncertain. It does appear, however, that when those efforts were abandoned the property quickly reverted to its former character.

Tract I is owned by FCF. PMA is a general partnership organized for the primary purpose of constructing and operating a peat-to-methanol synthetic fuel plant on Tract I. Peat for this process will be provided from the large deposits appearing on Tract I. Although FCF originally sought to mine peat from the entire tract, a permit issued by the North Carolina Department of Natural and Economic Resources on 21 February 1980 only allows FCF to mine peat on a 15,000-acre site on Tract I.

In order to mine peat on Tract I, excess water from the property must be drained through the construction of further drainage ditches and the use of pumps. In order to accomplish this task, PMA has applied for a state permit to pump three million gallons of ground water per day from the mining site. Once the soil is adequately drained, the vegetation will be removed and the surface tilled and sloped, to facilitate further drainage. The peat will then be removed through the use of sod machines and squeezed through a tube to create long cylindrical shapes. The peat, when formed into these cylindrical shapes, will be laid on the land surface to dry until ready for use in the peat-to-methanol plant to be built on Tract I.

The Corps consulted with FCF about its peat mining operations in late 1974, when FCF's plans were still confined to an up-

land area, not the subject of this litigation. In 1976, and again in April of 1978, the Corps advised FCF that expansion of its operations into new areas would necessitate a permit under § 404 since the proposed areas were probably wetlands within the Corps' jurisdiction.

During the spring of 1979, FCF began to solidify its plans to expand its peat mining into Tract I. In April of 1979, a member of the Corps inspected the proposed site on Tract I and advised FCF that some parts of its operations would "definitely" require a § 404 permit while a determination as to whether the whole operation would necessitate a permit required "further in-depth study" of the mining operations and "aerial photography possibly of the vegetation currently existing." FCF was further advised to request in writing a wetlands determination and to provide the Corps with further information about its operations.

On 3 July 1979, FCF formally asked the Corps to determine whether a § 404 permit was required for its proposed expanded operations. Following this request, the Corps visited Tract I on 15 July 1979, observed a small mining operation in progress, and took a "cross-country tour" of the proposed mining site. The actual extent of this tour is unclear. The document memorializing this visit notes that the vegetation included "shrubs" typically "pocosin" on the easternmost portion and that the large drainage ditches which bisect the area indicate "that the ground water level is considerably below the surface." [2]

On 15 August 1979, the Corps again visited the proposed mining site on Tract I and took another cross-country tour of uncertain detail. The Corps concluded that "vegetation typically found on a bog or pocosin area was prevalent and dominant throughout the majority of the mining area." Nevertheless, the Corps determined

---

**2.** Materials submitted by plaintiffs cast serious doubt on whether the depth of water in the canal is a true indicator of the ground water level in the surrounding area. These materials suggest that the canals affect the water table only minimally and only for a short distance on the land immediately adjacent to the canals.

that the vegetation alone was not a "sufficient indicator of wetlands that would fall under the Corps' jurisdiction" since the drainage network "most likely" had lowered the water table and dried the upper layers of soil. The Corps further stated:

[t]his determination that the area is a non-404 wetland carries one stipulation—that the site should be revisited during the late winter or early spring after a significant rainfall to determine then if the soils were saturated to the point of possibly reclassifying the area. It should be stressed that in an area with similar vegetation but without the extensive drainage that this area exhibits would be a very good candidate for inclusion under the Corps' jurisdiction.

The Corps did not appear to be fully satisfied with this preliminary conclusion, however. On 15 August 1980, Colonel Robert K. Hughes, then District Engineer of the Corps' Wilmington District, wrote a memorandum to Corps Headquarters in Washington, D.C., discussing problems the Corps was having in determining which areas of FCF's landholdings were "wetlands" under § 404. Colonel Hughes gave particular emphasis to the difficulties involved in making these determinations because of the extensive canals present on the property. He noted that the Wilmington office had requested the Division Engineer and the Regional Administrator of EPA to initiate a joint technical review board pursuant to "Memorandum of Understanding: Geographical Jurisdiction of the § 404 Program." 45 Fed.Reg. 45,018 (1980).

Subsequently, on 26 August 1980, a meeting was held in Washington, D.C., at which time a decision was made not to convene a technical review board since there was apparently "not (sic) Corps/EPA technical disagreement." Further, a decision was made that the Corps would send a letter to FCF advising it that Tract I did not constitute "wetlands" under the § 404 permit program. This letter was sent to FCF on 15 September 1980.

Although the record is sketchy, it appears that the Corps made at least two visits to Tract I following this wetlands determination. On 13 March 1982, a Corps staff member visited the property primarily to determine whether a methanol pipeline could be constructed on Tract I under an applicable nationwide permit. During May of 1983, a Corps member also visited the site for an undisclosed purpose. No notes or memoranda were prepared on this visit.

Sometime after the Corp's determination, in a letter dated 2 August 1983, the United States Fish and Wildlife Service requested the Corps to reconsider its position and exercise jurisdiction over Tract I. The Fish and Wildlife Service based this request, in part, upon the high water table on Tract I and the presence of wetland vegetation. It also contended that the drainage system had not caused Tract I to lose its wetland characteristics based upon the fact that PMA was required to obtain a state permit to allow it to pump three million gallons of water a day off the property. The Corps replied on 26 August 1983 stating, in essence, that it could not give a full response to the Fish and Wildlife Service's request since it had already received plaintiffs' statutory notice of their intention to sue over the matter.

After proper notice, this action was filed by plaintiffs challenging the wetlands determination. The private defendants filed a motion for summary judgment based upon the six-volume administrative record collected by the Corps and purporting to contain all materials relevant to the Corps' determination. The plaintiffs filed a cross-motion for summary judgment, and the federal defendants subsequently filed their own motion for summary judgment. The plaintiffs requested, and were granted by the court, permission to file supplemental materials designated as Volumes 7 through 10 in further support of their motion. All parties were given an opportunity to respond to these additional materials.

## II—CWA AND WETLANDS RESPONSIBILITY

Wetlands, in a non-legal sense, are areas characterized by vegetation growing in

soils that are periodically or normally saturated with water. Council on Environmental Quality, *Our Nation's Wetlands, an Interagency Task Force Report* (1978) (*Our Nation's Wetlands*), pp. 5–7. Marshes, swamps, and bogs are typical types of wetlands. Wetlands occur between upland areas and deep water areas, such as oceans, bays, rivers or lakes. Water levels in wetlands rise and recede in part according to rainfall, so that at times they may be quite dry. *Id., see also Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 913 (5th Cir.1983).

Wetlands are believed to perform important and unique ecological functions. For example, wetlands purify water by holding nutrients and recycling pollutants; they provide flood protection by retarding surface runoff from rainwater and shielding upland areas from storm damage; and they provide vital food resources and habitat for fish and wildlife. *United States v. Riverside Bayview Homes*, — U.S. —, —, 106 S.Ct. 455, 463, 88 L.Ed.2d 419 (1985), reversing 729 F.2d 391 (6th Cir.1984); 33 C.F.R. § 320.4(b)(2)(iv), (v) and (vii) (1985); *Our Nation's Wetlands*, 19–27. This is true even when the source of the moisture creating the wetlands is from ground or rain water, and not from the adjacent bodies of water. *United States v. Riverside Bayview Homes, supra* at —, 106 S.Ct. at 463.

The CWA is a comprehensive statute designed to "restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 301(a) of the CWA contains an absolute prohibition against the discharge of pollutants into the Nation's waters, except those discharges made in compliance with standards promulgated or permits issued under the Act. 33 U.S.C. § 1311(a). The Administrator of EPA and the Secretary of the Army, acting through the Chief of Engineers of the Army Corps of Engineers, share responsibility for issuance of permits under the CWA and enforcement of their terms. 33 U.S.C. § 1342 and § 1344.

Under § 404 the Corps is responsible for the administration of a permit program for the discharge of dredged and fill materials into "navigable waters." 33 U.S.C. § 1344(a). The EPA continues to carry ultimate responsibility for the overall concerns of the CWA, including determinations of what constitutes "navigable waters" for purposes of § 404. *See Avoyelles Sportsmen's League, Inc. v. Marsh, supra* at 903 n. 12; 43 Op. Att'y Gen. No. 15 (September 5, 1979). "Navigable waters" are defined as "waters of the United States including the territorial seas." 33 U.S.C. § 1362(7). Although at one time the Corps adopted the traditional, but narrow view of "navigable waters," its 1977 regulations substantially broadened the definition. Navigable waters are now specifically defined to include "all waters of the United States," which are further defined to include "wetlands." 33 C.F.R. § 323.2(a) and (b). For purposes of the § 404 permit program, "wetlands" are:

> those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas.

33 C.F.R. § 323.2(c).

Congress recognized the importance of protecting wetlands in order to achieve its statutory goal of restoring the chemical and biological integrity of our Nation's waters. As expressed by Congress at the time of the 1977 amendments to the CWA:

> ... The wetlands and bays, estuaries and deltas are the Nation's most biologically active areas. They represent a principal source of food supply. They are the spawning grounds for much of the fish and shellfish which populate the oceans, and they are passages for numerous upland game fish. They also provide nesting areas for a myriad of species of birds and wildlife.

The unregulated destruction of these areas is a matter which needs to be corrected and which implementation of section 404 has attempted to achieve.

1977 U.S.Code Cong. & Ad.News 4326, 4336.

There seems to be no serious dispute that the proposed peat mining efforts and construction of the peat-to-methanol plant are "[dredge] and fill" activities within the meaning of § 404. Thus, if Tract I is considered to be "wetlands," as defined in 33 C.F.R. § 323.2(c), a § 404 permit is required to proceed with these development plans.

### III—CONTENTIONS OF THE PARTIES

The plaintiffs contend, in essence, that the Corps abdicated its mandatory duty under § 404 to regulate dredge and fill activities on wetlands by declaring Tract I not to be "wetlands" within the meaning of the CWA. They also assert that the EPA violated the CWA by failing to prevent the Corps from so abdicating its duties and by failing to take appropriate action to prohibit PMA from discharging pollutants without a § 404 permit. Plaintiffs request the court to find that Tract I constitutes a "wetland" within the meaning of § 404, to require the private defendants to obtain a permit to continue their peat mining activities, and to issue other appropriate injunctive relief. In the alternative, they argue that the Corps' determination is arbitrary and capricious, and that the court should set it aside and remand the matter to the Corps for a wetlands redetermination.

The federal and private defendants contend that the court must defer to the Corps' determination unless it finds it to be arbitrary and capricious under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.* (1977). As might be expected, all defendants assert that the Corps' determination was not arbitrary and capricious, but entirely appropriate based upon the six-volume administrative record. Spe-

cifically, they contend the Corps made numerous visual inspections of Tract I and correctly concluded that the drainage canals had altered the hydrology of the land so that Tract I could no longer be considered to be "wetlands" within the meaning of § 404. The defendants contend that the Corps' administrative record is adequate to support its determination and urge the court not to rely upon the supplemental materials filed by the plaintiffs.

### IV—STANDARD OF REVIEW

■ Judicial review of the Corps' decision is governed by the APA. The APA provides in relevant part that a court shall set aside agency "findings, conclusions, and actions" that are "arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971), the Supreme Court made clear that this standard of review is highly deferential and that final agency action is "entitled to a presumption of regularity." But, although the "ultimate standard of review is a narrow one," the Supreme Court also made clear that the reviewing court must carefully "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Id.* at 416, 91 S.Ct. at 823. The reviewing court is not "empowered to substitute its judgment for that of the agency." *Id.* Rather, a reviewing court's duty is to hold the agency to "certain minimal standards of rationality" and not to inject its opinion in place of that of the agency who, because of its particular expertise, has been entrusted with the decisionmaking power. *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C.Cir.), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976).

■ This review is also limited in scope to the materials before the agency at

the time it made this decision, and a court must view critically any *"post hoc* rationalizations."  *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 419–20, 91 S.Ct. at 825–26.  If the agency's determination cannot be sustained based upon the record, then it must be remanded for further consideration.  *Camp v. Pitts,* 411 U.S. 138, 143, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).  The court may, however, under limited circumstances, consider matters outside of the record for background information.  *See, e.g., Asarco, Inc. v. EPA,* 616 F.2d 1153, 1160 (9th Cir.1980).

The plaintiffs contend, in essence, that the court should substitute its judgment in this case for that of the Corps.  In *Avoyelles Sportsmen's League, Inc. v. Marsh, supra,* the Fifth Circuit was similarly asked to substitute its judgment for that of the Corps and EPA on the ground that a wetlands determination involves a question of the Corps' basic jurisdiction.  In rejecting that contention the court noted that jurisdictional decisions often require the use of a particular agency's expertise, and the wetlands determination is no exception. *Id.*  The wetlands determination "which requires analysis of the types of vegetation, soil and water conditions that would indicate the existence of wetlands, is the kind of scientific decision normally accorded significant deference by the courts."  *Avoyelles Sportsmen's League, Inc. v. Marsh, supra* at 906; *see also FPC v. Transcontinental Gas Pipe Line,* 423 U.S. 326, 331, 96 S.Ct. 579, 582, 46 L.Ed.2d 533 (1976) (noting that agency was required to make decision concerning the factual predicates necessary to assert its statutory authority); *Deltona Corp. v. Alexander,* 682 F.2d 888, 893–94 (11th Cir.1982) (holding that Corps itself must first make determination on jurisdiction under § 404).  Although a few courts have not applied this deferential standard to wetlands determinations, they have done so without discussing what is the appropriate standard of review and are, therefore, unpersuasive.  *See, e.g., Bayou Des Familles Dev. v. United States Corps of Engineers,* 541 F.Supp. 1025 (E.D.La. 1982) (upholding Corps wetlands determination); *United States v. Lee Wood Contracting, Inc.,* 529 F.Supp. 119 (E.D.Mich. 1981) (enforcement action holding that land is "neighboring wetlands" within Corps' jurisdiction); *Parkview Corp. v. Dept. of Army Corps of Engineers,* 469 F.Supp. 217 (E.D.Wis.1979) (granting Corps' summary judgment motion that the land is a wetland under 1974 definition within Corps' jurisdiction); *P.F.Z. Properties, Inc. v. Train,* 393 F.Supp. 1370 (D.D.C.1975) (holding that Corps had jurisdiction over proposed site).  Thus, the Corps' wetland determination will be subject to the same limited judicial review employed to review other agency decisions.

## V—METHODOLOGY

The language of the Corps' 1977 regulations makes clear that aquatic vegetation is a primary indicator of wetlands, although its presence or absence will not always be determinative.  As explained in the preamble to the regulations, an area is a wetland within the Corps' statutory jurisdiction if it is:

> inundated or saturated by water at a frequency and duration sufficient to support aquatic vegetation.  This inundation or saturation may be caused by either surface water, ground water, or a combination of both.

42 Fed.Reg. 37,122, 37,128 (1977).  Thus, in addition to vegetation, the Corps must consider the water conditions (hydrology) and soils in order to make a wetlands determination.  *Avoyelles Sportsmen's League, Inc. v. Marsh, supra* at 906.

Neither the CWA nor the enabling regulations specify the precise methodology to be used by the Corps in analyzing the vegetation, hydrology, and soils.  The defendants argue that the Corps was able to adequately consider these factors by visually inspecting Tract I prior to its determination, and that it was unnecessary to perform any more in-depth studies or tests.

The plaintiffs contend, on the other hand, that failing to more thoroughly study the soils, hydrology and vegetation amounted, in essence, to a failure to meaningfully consider these factors. The issue in this case is, then, whether the methods employed by the Corps meet the minimal degree of rationality necessary to uphold its decision under the APA.

Certainly there will be cases where the Corps will be able to determine the character of an area from one or two visual inspections. In obvious wetland areas, it will be abundantly clear that aquatic vegetation is prevalent and that the necessary inundation and saturation is present. In other cases, the complete absence of these characteristics will be readily apparent and no further visits, tests, or studies will be required. To require more in-depth investigation under these circumstances will unnecessarily burden the Corps with meaningless tasks.

In a third class of cases, however, the peculiar environmental characteristics of a particular tract of land may make it much more difficult for the Corps to determine whether wetlands are present. The Corps must then use its scientific expertise to analyze the nature of the land to determine what methods are reasonably necessary to make an accurate decision. Under these circumstances the burden necessarily will be greater on the Corps to study the property in order to make a jurisdictional determination. *See, e.g., City Fed. Sav. & Loan Ass'n v. Fed. Home Loan Bank Board,* 600 F.2d 681, 689 (7th Cir.1979) (holding that agency must provide more in-depth explanation for issues subject to vigorous controversy).

Because its environmental character is not readily apparent, Tract I falls into this third class of cases. Although the Corps recognized that Tract I may have been a wetland at one time, it ultimately concluded that the drainage system had altered its character. The preamble to the 1977 regulations makes clear that lawful development may, in fact, change an area's character. 42 Fed.Reg. 37,122, 37,128. But whether development has progressed that far in any given case may present a difficult question. This is especially true in this case since the Corps seems to acknowledge that one main wetland indicator—aquatic vegetation—remains present on the property. Moreover, in spite of the questions concerning the altered conditions, the Corps failed to conduct an in-depth investigation to determine exactly when the canals were constructed and the vegetation removed. There is nothing in the record, then, which indicates whether the Corps believes that the canals were built and the vegetation removed before or after enactment of the CWA.

Although the Corps initially leaned towards a finding that Tract I was, at least in part, a wetland, it ultimately seemed quite uncertain over its proper characterization. As early as 1976, a Corps investigator indicated his belief that Tract I contained at least some wetlands. Later, in 1979, this belief was affirmed preliminarily, but the investigator recommended "aerial photography possibly" of the vegetation. During August of 1979, a Corps investigator noted that Tract I contained a prevalence of "vegetation typically found in a bog or pocosin (types of wetlands)." For the first time, however, the Corps investigator noted that Tract I might not be a wetland because of a "likely" change in the water table as a result of the drainage network. This tentative conclusion was explicitly conditioned on at least one further visit to the property in late winter or early spring after a significant rainfall. This trip was never made. The Corps' failure to make this trip is particularly significant since the regulatory definition of wetlands makes clear that wetlands are not limited to areas that are permanently inundated. *Avoyelles Sportsmen's League, Inc. v. Marsh, supra* at 913. Thus, the level of inundation may not be apparent from one or two visits during a single season of the year.

Moreover, just one month before the Corps finally resolved the jurisdictional is-

sue, the then District Engineer for the Wilmington District wrote to Corps Headquarters in Washington, D.C., to discuss the difficulties the Corps was experiencing in making a final jurisdictional determination on Tract I as a result of, in part, the effects of the drainage system. The District Engineer noted that the Corps had requested EPA to convene a joint technical review board pursuant to a "Memorandum of Understanding: Geographical Jurisdiction of the § 404 Program." 45 Fed.Reg. 45,018. This board, had it been convened, would have consisted of experts from relevant fields who would have assisted the Corps in making its final decision. In spite of the obvious difficulties with the characterization of Tract I, a mere week and a half after the District Engineer sent the letter to Corps Headquarters, the Corps withdrew its request for a technical review board and determined that Tract I was not a wetland under its jurisdiction. The Corps arrived at this final decision without performing any further studies or tests, including the aerial photography or the revisit recommended by its own staff.

This procedure can hardly suffice to meet the Corps' obligation under the CWA to make a reasoned decision. *Sierra Club v. United States Army Corps of Engineers,* 701 F.2d 1011, 1032–33 (2d Cir.1983) (holding that failure of the Corps to conduct an independent investigation and its reliance on an obviously questionable EIS in issuing a § 404 permit is arbitrary and capricious). *Buttrey v. United States,* 690 F.2d 1170, 1185 (5th Cir.1982), *cert. denied,* 461 U.S. 927, 103 S.Ct. 2087, 77 L.Ed.2d 298 (1983) (although the Corps did not conduct its own investigation, it relied upon credible information and reports supplied by other individuals and agencies including the Fish & Wildlife Service, the Environmental Protection Agency and the National Marine Fisheries Service). There is no evidence in the administrative record that the Corps gathered any information about the level of inundation during any time other than July and August of 1979. Similarly, there is no indication that the soils were ever analyzed or the vegetation meaningfully evaluated. Since it is clear that Tract I presented a difficult jurisdictional question for the Corps, its determination cannot stand without some scientific basis disclosed in the record.

The defendants also contend, in essence, that if the Corps' pre-determination methodology is lacking, any defect was cured by its post-determination visits to the property in March of 1982 and May of 1983. As noted above, this court must view "critically" any such *"post hoc* rationalizations." *Citizens to Preserve Overton Park v. Volpe, supra,* 401 U.S. at 419–20, 91 S.Ct. at 825–26. The March 1982 visit appears to have been a limited visit made primarily for the narrow purpose of determining the propriety of constructing a methanol pipeline under a nationwide permit. Moreover, there is no discussion in the record of any relevant observations made during the May 1983 visit. Thus, these visits do not provide any further reasoning to cure the defects in the Corps' methodology.

Finally, as an alternative theory, the private defendants urge the court to apply the Sixth Circuit's decision in *United States v. Riverside Bayview Homes, Inc,* 729 F.2d 391 (6th Cir.1984), *rev'd,* —— U.S. ——, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). In *Riverside,* the Sixth Circuit interpreted the inundation requirement of the Corps' regulations to mandate frequent flooding from adjacent navigable waters. That decision has recently been reversed by a unanimous Supreme Court. *United States v. Riverside Bayview Homes, Inc.,* —— U.S. ——, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985).

■ In short, there is no scientific basis in the record supporting the Corps' final determination, or its sudden ability to resolve a question it previously found so difficult. Given the apparently ambiguous character of Tract I, minimum rationality suggests that the Corps' investigation must be more in-depth than the casual vis-

ual observations disclosed in this record. The Corps' determination must be based on sound scientific analysis of the vegetation, hydrology and soils employed after actual investigation into those factors. Since that analysis is lacking, the determination of the Corps cannot be upheld and will be set aside as arbitrary and capricious.

The court is aware of the efforts of PMA and FCF to comply with the numerous state and federal regulatory requirements. In addition to providing all information requested of them, PMA voluntarily commissioned numerous studies to assess the environmental impacts of the peat mining operations, even though these studies were not required by law. On the other hand they apparently pressured the Corps into a hasty wetlands jurisdictional determination. Unfortunately, the delicate environmental problems presented by the proposed development of Tract I are not capable of quick and easy solutions. And, despite PMA and FCF's efforts, this court is required to insure that the federal defendants comply with their statutory responsibilities in addressing the difficult problems, like the ones presented here, that often arise when business interests and the environment conflict.

## VI—RELIEF

The plaintiffs contend that, upon remand, the court should give the Corps specific instructions on how to properly proceed in making its wetlands determination. Although this court is empowered to review jurisdictional decisions to determine whether they are arbitrary or capricious, the ultimate responsibility rests with the Corps to employ its scientific expertise to develop an appropriate methodology. *FPC v. Transcontinental Gas Pipe Line, supra,* 423 U.S. at 333–34, 96 S.Ct. at 583–84.

The motions of defendants for summary judgment are denied, and the motion of plaintiffs for summary judgment is allowed. An appropriate order will issue.