GOLDEN GATE AUDUBON SOCIETY,
INC., et al., Plaintiffs,

v.

UNITED STATES ARMY CORPS OF
ENGINEERS, et al., Defendants.

No. C 87–6063 TEH.

United States District Court,
N.D. California.

May 6, 1988.

Alan Waltner and Thomas Roy Gorman, Gorman & Waltner, Oakland, Cal., Zach Cowan, San Francisco, Cal., for plaintiffs.

Gail Cooper, U.S.E.P.A., Office of the General Counsel, Karen L. Egbert, Environmental Defense Section, Washington, D.C., for defendants.

## ORDER

THELTON E. HENDERSON, District Judge.

This matter comes before the Court on defendant Port of Oakland's (hereafter "Port") motion to dismiss, various federal defendants' motion to dismiss and stay discovery, and plaintiffs' motion for summary judgment on their second cause of action. After careful consideration of the parties' papers and oral arguments, the Court vacates the Corps' prior jurisdictional disclaimer and remands the wetlands determination to the Army Corps of Engineers ("Corps") with the instructions provided below. The Court retains jurisdiction over the action, stays further adjudication of the dismissal motions of the first, second and fourth causes of action, but dismisses the third cause of action with prejudice. The Court also grants plaintiffs' summary judgment motion on the second cause of action, and stays all discovery in this action.

*Factual Background.*

This case concerns the Port's dredging and filling of the "Distribution Center" (hereafter "center" or "site") adjacent to the San Leandro Bay. It asks the question: "at which point water ends and land begins." *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 462, 88 L.Ed.2d 419 (1985).

The Port allegedly began dredging and filling the waters of the San Leandro Bay in 1965, prior to the passage of the Clean Water Act. 33 U.S.C. §§ 1251 et seq.

During the mid–60's and early 1970's, the Corps administered a permit program under Section 10 of the Rivers and Harbors Act of 1899. 33 U.S.C. § 403. The Corps had advised the Port that the site was not within their jurisdiction. According to the Port, by 1972, the year the Clean Water Act was enacted, "the entire site had been completely filled" and the "area was transformed into dry land." Port's Memorandum of Points and Authorities in Opposition to Plaintiffs' Summary Judgment Motion ("Port's Memorandum") at 5.[1] From 1972 through 1986, the Port continued to improve the basement fill and raise the elevation of the site.

In late 1986, the Corps inquired into the Port's filling activities. Representatives of the Corps met with the Port's staff to visit the site and discuss its development. On November 7, 1986, Lt. Col. Andrew Perkins, Jr., the District Engineer of the Corps, orally concluded that the site had been converted into dry land. Since the Corps' jurisdiction only extends to navigable waters, 33 U.S.C. § 1344(a), the Corps determined that they had no jurisdiction over the site. Accordingly, the Corps informed the Port that they were not required to apply for a permit before continuing with the filling activities.

Following this "determination", the Environmental Protection Agency ("EPA") inspected the site and reviewed a study prepared by an expert on wetlands. On January 12, 1987, the EPA found that the site did contain wetlands, and issued Findings of Violation and Order for Compliance against the Port.

Soon thereafter, the Port filed a lawsuit against the EPA, seeking withdrawal of the EPA's findings. *City of Oakland v. EPA*, No. C 87–3516 RHS. During this suit, the Port deposed Lt. Col. Perkins, who stated that he had indeed made a jurisdictional finding on November 7 by orally informing the Port that the site did not contain wetlands. Prior to this deposition, the EPA apparently believed that the Corps

---

1. Plaintiffs vigorously contest those assertions; they contend that the site has never been transformed into dry land.

had not made a jurisdictional finding. When it learned from the Perkins' deposition that the Corps had disclaimed jurisdiction on November 7, the EPA voluntarily withdrew its January 12 Findings and Order, declaring them null and void.

Following the EPA's withdrawal of its Order, plaintiffs, three prominent environmental groups, filed this lawsuit. The complaint states four causes of action. In the first cause of action, plaintiffs allege that the site does contain wetlands, and the Port's continued dredging and filling violates 33 U.S.C. § 1311(a), which prohibits the discharge of pollutants into navigable waters without a permit. In the second cause of action, plaintiffs sue the Corps for erroneously deciding that the site does not contain wetlands. They also allege that the Corps violated procedural regulations in making the determination. In the third cause of action, plaintiffs sue the EPA and the Corps for failing to assert jurisdiction over the site; in the fourth cause of action, plaintiffs sue the EPA for failing to enforce the Port's compliance with the permit program. 33 U.S.C. § 1344(a).

The Port has moved to dismiss all four causes of action. They argue that plaintiffs fail to state a cause of action against the Port for illegal permitless discharge, since the Corps determined that no permit was required. They also contend that the second, third, and fourth causes fail to allege federal subject matter jurisdiction.

Plaintiffs, on the other hand, move for summary judgment on their second claim, arguing that the Corps erroneously found that the site contained no wetlands. Plaintiffs also seek an order remanding that determination to the EPA.

The federal defendants also seek a remand, but they argue that the Corps, not the EPA, should reconsider the wetlands determination. The federal defendants also move for a stay on all discovery pending renewed consideration by the Corps.

## 1. Federal Subject Matter Jurisdiction.

Before turning to the merits of the parties' disputes, the Court must first determine whether it has subject matter jurisdiction over the central issue in the case: the propriety of the Corps' determination that the site contained no wetlands.

In their complaint, plaintiffs assert four bases for federal jurisdiction.[2] First, plaintiffs claim that since they have sued the port under the citizen standing provision in 33 U.S.C. § 1365(a)(1) for violation of the Act, and since the Port will rely on the Corps' jurisdictional disclaimer as a defense to the enforcement claim, the propriety of that determination is placed in issue.

The Port characterizes this jurisdictional argument as "bootstrapping." They contend that the well-pleaded complaint rule bars plaintiffs from relying upon an anticipated defense to confer federal subject matter jurisdiction. *Louisville & N.R. Co. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908).

That rule has no applicability to this case. The rule governs cases in which a plaintiff raises only state law causes of action in her complaint, and seeks federal jurisdiction on the grounds that the defendant will advance a defense that raises federal law questions. The Supreme Court has held that if a plaintiff fails to raise federal questions in her complaint, the federal court must dismiss the action, no matter how likely it is that the defendant will raise and litigate federal claims. *Id.* 211 U.S. at 152, 29 S.Ct. at 43.

In this case, the enforcement cause of action *itself* arises under federal law. 31 U.S.C. § 1365(a)(1). Since the Court has jurisdiction over that claim, we have "jurisdiction" to review all pertinent issues necessary for adjudicating that cause of action, including the propriety of the Corps' jurisdictional disclaimer. Thus, the Port is factually incorrect that plaintiffs are relying on an anticipated defense to confer federal jurisdiction; they already have al-

2. Since the Court finds that it has jurisdiction under the first and second theories offered by the plaintiffs, *see infra* at 1552–1554, we do not examine the validity of the third and fourth theories.

leged federal jurisdiction under section 1365(a)(1).[3]

Even without the enforcement cause of action, however, plaintiffs have alleged federal jurisdiction under Section 1365(a)(2). That section empowers citizens to sue the Administrator of the EPA for failure to perform a mandatory duty.

■ The Port advances two arguments against the application of this provision. First, they aver that the provision only permits citizen suits against the EPA, not the Corps. Second, they contend that the Corps did not fail to perform a mandatory duty by determining that there was no federal jurisdiction over the site. We will consider each in turn.

A. Application of 1365(a)(2) to the Corps.

The Corps argues that since section 1365(a)(2) states that plaintiffs may sue the *EPA* for violations of mandatory duties, plaintiffs have not stated a cause of action against the *Corps* for violation of that section. The Court disagrees with the Port's construction of the statute, despite the provision's plain language; such an interpretation is contrary to the Act's purpose and history, and leads to absurd results that Congress could not have intended.

The Clean Water Act of 1972 (CWA) was enacted as a series of amendments to strengthen the Federal Water Pollution Control Act of 1948. *Middlesex County Sewerage Auth. v. National Sea Clammers*, 453 U.S. 1, 11, 101 S.Ct. 2615, 2621, 69 L.Ed.2d 435 (1981). The objective of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve that goal, the CWA prohibits the discharge of pollutants without a permit. 33 U.S.C. 1311(a). Under the CWA, the Corps issues permits for the discharge of dredge and fill material. 33 U.S.C. § 1344(a).

As noted by Attorney General Civiletti, at the time the permit program was enacted, Congress considered the "hotly debated" question of "whether the Secretary [of the Army] should play any role, through the Chief of Engineers, in issuing permits . . ." Opinion of the Attorney General of the United States, Sept. 5, 1979 (hereafter "Opinion") at 2. The Senate Bill, S. 2270, gave the EPA authority to issue permits for dredging and filling. *Id.* Amendments were proposed to S. 2270 to give that authority to the Corps. The Senate rejected these amendments and passed a provision proposed by Senator Muskie that allowed the Corps to certify the need for a permit to the EPA, but gave the EPA the permit issuing authority. *Id.* at 3.

The House of Representatives, on the other hand, gave the Corps complete responsibility over the permit program. *Id.* The Conference Committee substitute, passed by both Houses, compromised these two positions. It "established a separate permit procedure for discharges of dredge or fill material" to be administered by the Corps, but gave the EPA "substantial responsibility over administration and enforcement" of the permit program. *Id.*

However, the Act left a critical question unanswered: does the EPA or the Corps have the final authority to determine whether a proposed development occurs on navigable waters, and is therefore within the jurisdiction of the CWA?

The Civiletti Opinion addresses this question. Construing the statute and the legislative history, the Attorney General concluded that Congress vested the EPA with the final authority. He based his opinion on the fact that the EPA has overall responsibility for the CWA and interprets the term "navigable waters" under other sections of the Act. *Id.* at 5. In addition, he

---

**3.** The Port does seek dismissal of the first claim as well. However, as noted *infra* at 1559, dismissal of the first claim is premature, since the plaintiffs may have a viable enforcement claim if the Corps' wetlands determination is overturned. Nevertheless, we do agree with the Port that the enforcement cause of action may not be based on violation of the EPA's January Order, since the EPA rescinded and nullified the order, and plaintiffs may not sue for past violations of the CWA. *Gwaltney of Smithfield v. Chesapeake Bay Foundation*, —— U.S. ——, 108 S.Ct. 376, 98 L.Ed.2d 306 (1984).

noted that the Act empowers the EPA to enforce compliance with the permit program and develop guidelines regarding the selection of the disposal sites. *Id.* at 6.

It is against this backdrop that the citizen suit provision of section 1365 must be construed. That provision was intended to provide an alternative to EPA enforcement of, *inter alia*, the permit program, by empowering citizens to sue as "private attorneys general" to redress violations of the Act. *Sea Clammers, supra*, 453 U.S. at 16–17, 101 S.Ct. at 2624–25. Congress did state that under section 1365(a)(2) citizens may sue the EPA, but they did so upon the recognition that the EPA has overall authority for enforcing the Act, which includes the power to make final jurisdictional determinations. It is wholly illogical to assume that Congress intended to allow citizens to challenge erroneous wetlands determinations when the EPA makes them, but prohibit such challenges when the Corps makes the determination and the EPA fails to exert its final authority over the Corps' determination. The Port's statutory interpretation requires us to make precisely that unfounded assumption.

Moreover, the sharing of power between the EPA and the Corps under the "Memorandum of Understanding Geographic Jurisdiction of the § 404 Program," 45 Fed. Reg. 45018 (July 2, 1980), (hereafter "MOU") also undercuts the Port's reading of the statute. The MOU expands upon the Civiletti opinion to establish a division of authority. Under the MOU, when inquiries are made regarding federal jurisdiction, the Corps must first determine whether the inquiry involves a "special case," meaning situations with difficult technical issues, significant environmental consequences, or cases in which EPA has declared a special interest. *Id.* at 45019, ¶¶ 4, 5. If the Corps finds that the inquiry involves a special case, the EPA decides the jurisdictional issue. *Id.* at 45019, ¶ 7. If it is not a special case, the Corps makes a written determination that is binding. *Id.* at 45019, ¶ 4. The MOU also provides for joint review if the Corps and EPA find that joint review would be helpful. ¶ 9.

The Port's interpretation, interposed against the MOU, leads to absurd results. For example, if the Corps finds that an inquiry involves a special case, and therefore forwards the determination to the EPA, a citizen could challenge that determination under section 1365. However, if the Corps finds it is not a special case, and makes the jurisdictional determination itself, then that determination would not be reviewable under section 1365. Thus, the Corps can insulate itself from all judicial review by not finding special cases, while the EPA, the agency with greater expertise in evaluating environmental consequences, remains exposed to review. Such a reading of the statute is directly at odds with Congress' finding that the EPA could be better trusted to make environmentally-sensitive determinations. *See, e.g.*, statement of Senator Muskie in Senate Comm. on Public Works, 93rd Cong., 1st Sess. *A Legislative History of the Water Pollution Control Act Amendments of 1972*, at 1386–1387.

Moreover, the MOU, coupled with the Port's reading of the statute, operates to deprive the federal court of subject matter jurisdiction whenever the Corps alone decides the extent of navigable waters. This judicial preclusion directly conflicts with the Supreme Court's admonition that "judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive evidence to believe that such specifically was the intent of Congress." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967).

To avoid these results, the Court construes section 1365(a)(2) to provide for judicial review of Corps' jurisdictional decisions made pursuant to the power-sharing arrangement in the MOU. For the purposes of making those decisions, we hold that the Corps stands in the shoes of the EPA. The Court is mindful of the importance of adhering to the plain language of a statute, but as other courts have noted, "[p]roper statutory construction requires more than linguistic examination." *Siera Club v. Train*, 557 F.2d 485, 490 (5th Cir.1977). When the result of a plain language read-

ing is "unreasonable, while the result of another interpretation is logical, the latter should prevail." *Id.*

This conclusion is fully consistent with the scant case law on the subject. *See, e.g., National Wildlife v. Hanson,* 623 F.Supp. 1539, 1544 (E.D.N.C.1985) and 18 E.L.R. 20008, 20009 (E.D.N.C.1987), allowing citizens to sue the Corps under section 1365(a) for an erroneous wetlands determination; *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897, 904 (5th Cir. 1983) and 786 F.2d 631, 634 (5th Cir.1986), allowing a suit against the Corps and the EPA for a wetlands determination made by the EPA; *Leslie Salt v. U.S.,* 660 F.Supp. 183, 184–185 (N.D.Cal.1987), allowing a suit against the Corps for an erroneous wetlands determination *and* ordering *de novo* trial on that issue.

Nor does this holding conflict with *National Wildlife Federation v. Ruckelshaus,* 21 ERC 1776 (D.N.J.1983). In that case, the court held that plaintiffs could not sue the New Jersey Department of Environmental Protection under 1365(a)(2). The court noted that in *Sea Clammers, supra,* 453 U.S. at 14–15, 101 S.Ct. 2623–24, the Supreme Court cautioned against implying remedies beyond those identified in the CWA. The court applied *Sea Clammers* and found that Congress did not intend to make state authorities subject to the 1365(a)(2) standing provision. In contrast, in this case we find that Congress did intend to allow citizens to sue the Corps for making determinations for which the EPA has final responsibility. We base this conclusion on the palpable illogic of holding otherwise. That same illogic does not attend to the congressional decision that citizens can sue an agency of the federal government, but not a state authority, for failure to perform a mandatory *federal* duty.

**B. Mandatory Duty.**

■ The Port also argues that even if the Corps can be named as a defendant under section 1365(a)(2), the Corps' jurisdictional disclaimer did not constitute a failure to perform a mandatory duty as required by that section. · We disagree.

■ All three parties agree that the Corps did make a wetlands determination. While the Corps may or may not have a mandatory duty to make jurisdictional determinations over sites, once it makes such a determination, it must do so correctly. The Corps has a mandatory duty to ascertain the relevant facts, correctly construe the applicable statutes and regulations, and properly apply the facts to the law. See, e.g., *Avoyelles, supra,* 715 F.2d at 906, reviewing EPA wetlands determination to ensure that the EPA correctly ascertained the extent of the wetlands on the site in question. Plaintiffs claim that the Corps breached that duty by incorrectly construing the regulatory definition of wetlands and erroneously finding that the center was transformed into dry land by 1972. The Port argues the reverse, that the Corps correctly interpreted the "normal circumstances" language of 40 C.F.R. § 230.3(t), 33 C.F.R. § 328.3(b) and rightly determined that the site had been transformed into dry land. Whichever party is right on these legal and factual issues, there can be no question that it is mandatory, and not discretionary, for the Corps' decisions to be correct.

This conclusion is supported by the numerous court decisions allowing judicial review of Corps' wetlands determinations. *See* cites, *supra* at 1553. Moreover, the Port cites no cases to the contrary. Instead, the cases cited by the Port all involve the very different question of whether the EPA has a mandatory duty to *enforce* the permit program. Though there is some split in authority in this issue, most courts have concluded that the EPA does not have a mandatory duty to issue enforcement orders. *See, e.g., Sierra Club v. Train, supra,* 557 F.2d at 490–491; *Dubois v. Thomas,* 820 F.2d 943, 946–947 (8th Cir. 1987). These and other courts concluded that the seemingly mandatory language of the enforcement provision in section 1319(a)(3) stating that the EPA "shall" issue enforcement orders must be read in conjunction with section 1319(b), which

gives the EPA the discretion to bring civil suits to enforce any orders issued under section 1319(a)(3). These courts have also recognized that judicial review of an agency's enforcement decisions is usually inappropriate, since those decisions "involve a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise" such as whether "agency resources are best spent on [one] violation or another" and "whether the particular enforcement action requested best fits the agency's overall policies" and resources. *Heckler v. Chaney*, 470 U.S. 821, 831, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985).

These concerns are not implicated here. The Corps has already investigated the site and made a jurisdiction decision. Thus, the Court is not balancing the factors described in *Chaney* and instructing the Corps on how to expend its resources. Therefore, these cases do not bar the conclusion that the Corps' allegedly erroneous determination is reviewable under section 1365(a)(2).

For these reasons, the Court finds it has jurisdiction over the Corp's wetlands determination. The Port's motion to dismiss the second cause of action is therefore denied, and we proceed to determine the remaining issues.

### 2. The Jurisdictional Disclaimer.

■ As noted, plaintiffs seek summary judgment on their second cause of action against the Corps for making an allegedly erroneous wetlands determination. Though the Corps has moved to remand the action, we nevertheless will review the Corps' prior order since it represents final agency action under the Administrative Procedure Act, 5 U.S.C. § 704, and because the Port is presently relying on that determination as a defense to liability under the first cause of action.[4]

We review the wetlands determination under Section 706(a)(2) of the APA. *Avoyelles, supra*, 715 F.2d at 904. *But see Leslie Salt Co. v. United States*, 660 F.Supp. 183 (N.D.Cal.1987), ordering *de novo* review. Section 706(a)(2) provides that the reviewing court shall set aside agency findings only if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." While this standard of review is deferential to the agency, courts may not abdicate their responsibility to review the agency's action under this standard by rubberstamping the agency's conclusions. *See, e.g., Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), in which the Supreme Court vacated the National Highway Traffic Safety Administration's (NHTSA) rescission of a rule mandating the installation of passive restraints in automobiles, since NHTSA failed to review all relevant evidence and made a clear error of judgment in rejecting the safety benefits of automatic seatbelts. Instead, the arbitrary and capricious standard calls upon courts to make a "searching and careful" review of the record to determine whether the agency's "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

■ Plaintiffs contend that the Corps incorrectly construed the regulatory definition of wetlands. Under 33 C.F.R. 328.3(b), wetlands are defined as:

those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation

---

4. We reject the federal defendants' argument that the doctrine of primary jurisdiction precludes Court review of the Corps' decision. The Court *will* remand the agency's decision, rather than determining the merits of the issue itself. *See infra* at 1557. Thus, the Court is abiding by the purpose of the doctrine, which is to enable an agency to exercise its expertise and correct its own errors. *Klicker v. Northwest Airlines, Inc.*, 563 F.2d 1310, 1313 (9th Cir.1977). In addition, since the Port is relying upon the Corps' prior determination as a defense to the enforcement claim, this Court's failure to vacate the prior determination could have the effect of permitting filling activity which the Corps may subsequently find to be illegal.

typically adapted for life in saturated soil conditions.

This definition, promulgated in 1977, amended a prior definition. The Corps advanced two somewhat contradictory reasons for its amending of the prior definition. On the one hand, the amendment was intended to "respond to those situations in which an individual would attempt to eliminate permit review requirements of Section 404 by destroying the aquatic vegetation." 42 Fed.Reg. at 37128. The Corps found that "[s]everal such instances of destruction of aquatic vegetation in order to eliminate Section 404 jurisdiction actually have occurred." *Id.* The Corps then stated that "even if this destruction occurs, the area still remains as part of the overall aquatic system intended to be protected by the Section 404 program." *Id.*

On the other hand, the Corps also stated that it did "not intend, by this clarification, to assert jurisdiction over those areas that once were wetlands and part of an aquatic system, but which, in the past, have been transformed into dry land for various purposes." *Id.*

The Corp's application of this regulation to the distribution center is expressed in the January 23, 1987 letter from acting District Engineer Kenneth H. Clow to Thomas Clark, the Port's attorney. The Corps states that the site "does contain areas which are biological wetlands." Letter at 1. Nevertheless, the Corps determined that "those areas would not be wetlands 'under normal circumstances' " since the " 'normal circumstances' for these areas is that they are part of a longstanding and ongoing fill project" in which the wetlands appear between dormant stages of the project. *Id.* The Corps found that the site had been filled at least once over the years, and that the periodic wetland vegetation appears as a result of "the practice of filling only small areas at a time." *Id.* at 2.

In essence, the Corps found that the filling of the wetlands, and its transforma-

tion from wet to dry land, constitutes the normal circumstances of the site. In defending this interpretation of the normal circumstances language, the Port relies heavily on the Corps regulatory statement that it did not intend to "assert jurisdiction over the areas that once were wetlands and part of an aquatic system, but which, in the past have been transformed into dry land for various purposes." 42 Fed.Reg. at 37128. They also rely on the Corps' recent regulatory guidance letter, in which the Corps states that "if a former wetland has been converted to another use" and "that use alters its wetlands characteristics to such an extent that it is no longer a 'water of the United States,' " the Corps will not assert jurisdiction over that site. Regulatory Guidance Letter No. 86–9, August 27, 1986 at 2.

The Port argues that this languages exempts them from the permit requirement. The Port contends that since it allegedly converted the area into another use and altered its wetland characteristics, the Corps correctly disclaimed jurisdiction over the site.[5]

We believe the Port has read this language too broadly. That language must only apply to those situations in which wetlands were converted to dry land before 1975, the date the Corps acquired jurisdiction over adjacent wetlands. *See* description of interim regulation, 42 Fed.Reg. at 37124. Without this temporal limitation on the language, a developer could surreptitiously fill a site to destroy jurisdiction, and then avail itself of this "conversion" exemption from the permit requirement. Thus, this language would permit the very evil that the regulation is intended to prevent: the destruction of wetlands to eliminate the permit requirement. 42 Fed.Reg. at 37128.

This temporal limitation on that language is consistent with the Corps' purpose in promulgating the normal circumstances regulation. The normal circumstances regulation clarified and broadened the 1975

---

**5.** The plaintiffs vigorously contend that the site is still not dry land. Two EPA experts who have studied the site agree with plaintiffs. *See* discussion of Huffman and Williams reports, *infra* at 1558.

interim regulation. 42 Fed.Reg. at 37128. In broadening the definition, the Corps undoubtedly wished to assure developers that it did not intend to retroactively assert jurisdiction over sites that had previously been converted to dry land by the time the 1975 regulation was enacted. This language responds to that concern.[6]

Moreover, the Port's interpretation of the normal circumstances language and the conversion exemption violates Congressional intent. Congress passed the permit review program as part of a "comprehensive legislative attempt 'to restore and maintain the chemical, physical, and biological integrity of the nation's waters.'" *United States v. Riverside Bayview Homes, Inc.,* 474 U.S. 121, 106 S.Ct. 455, 462, 88 L.Ed.2d 419 (1985), citing 33 U.S.C. § 1251. That objective "incorporated a broad, systemic view of the goal of maintaining and improving water quality." 106 S.Ct. at 462. Congress intended to preserve "'the natural structure and function of ecosystems,'" *id.,* quoting H.R.Rep. No. 92–911, p. 76 (1972), and therefore "chose to define the waters covered by the Act broadly." 106 S.Ct. at 462. Congress achieved that goal in part by prohibiting the discharge of pollutants without a permit. 33 U.S.C. § 1311.

Allowing developers to illegally discharge fill materials without a permit and then rely upon that illegality to evade further compliance with the permit program eviscerates this central feature of the CWA. Therefore, we hold that permitless discharges of fill material that are in violation of the CWA may not be used to establish the normal circumstances of a site.

Thus, we find that the Corps' determination that permitless filling can establish the site's normal circumstances is arbitrary, capricious, and contrary to law.

The Port has a fallback argument: they contend that even if the unauthorized filling may not establish the normal circumstances of the site, the site was converted into dry land by 1975, the year the Corps acquired jurisdiction over adjacent wetlands. However, the Corps never made a finding that the site was converted into dry land in 1975.[7] Instead, the Corps found that the Port began filling in 1965, filled it slowly in accordance with standard engineering practice, and had never abandoned the project. Clow letter at 1. The Corps also concluded that the entire area had been filled, but it did not state *when* the site had been filled. *Id.*

Thus, the Corps' findings do not adequately recognize or reconcile the competing tensions of the regulatory definition. If in fact the Port had not transformed the site into dry land by 1975, and instead was eliminating Section 404 jurisdiction by filling the site, the Corps was precluded from finding that the filled site constituted its normal circumstances. If the site had been transformed into dry land by 1975, however, the Corps could find that the dry land was its normal circumstance, since the regulatory definition does not retroactively extend the Corps' jurisdiction over areas that have been transformed into dry land.

If the Port wishes to rely on its filling activities, it must show that the site was dry land in 1975. Accordingly, vacate the Corps' prior determination. We also remand the issue to the Corps to reconsider

---

6. This construction of the regulation is also consistent with court decisions interpreting that language in similar factual situations. For example, in *United States v. Ciampitti,* 583 F.Supp. 483, 493–494 (D.N.J.1984), a defendant developer argued that since a railroad embankment barred the entry of tidal flow onto the site for some period of time, the site was not a wetlands. The court rejected the argument, since the site was wet when the defendant began filling it. The court stated: "the history of the site is not relevant *unless* it indicates that the land was fast [in 1975] when the Corps claimed jurisdiction ... As long as it was wet when the fill activity began, the history of the site is

irrelevant." (emphasis added). Similarly, in *United States v. Bradshaw,* 541 F.Supp. 880, 883 (D.Md.1981), a defendant property owner argued that his land was not wetlands, contending that the area was "highlands" which only later became a marsh after the government constructed a mosquito ditch. The court held that even if this were true, the owner was liable for removal costs since the site was wet when the filling activity began.

7. The photointerpretation of the aerial photographs, discussed *infra* at 1558, indicates that the site was not dry land in 1975.

the extensive body of evidence regarding the history and present condition of the site in light of this Court's order.

### 3. Remand Issue.

■ As previously noted, plaintiffs urge us to remand the issue to the EPA and not the Corps. The federal defendants, on the other hand, contend that the Corps should reconsider the issue.

Plaintiffs' legal argument for a remand to the EPA is unpersuasive. Plaintiffs argue that the EPA made a binding jurisdictional decision by issuing its January 1987 findings. Since the MOU provides that jurisdictional determinations made by the EPA are binding on the Corps, 45 Fed.Reg. 45019 at ¶ 6, plaintiffs maintain that the Corps now has no authority to reconsider the issue.

This argument is completely undercut by the fact that the EPA rescinded the January findings, declaring all rights and obligations under the findings null and void. Since the EPA's assertion of jurisdiction has been nullified, and the Corps' determination remains in effect.[8]

Plaintiffs do advance some persuasive practical reasons for remanding to the EPA. They argue that EPA has extensively examined and analysed data on the site. They also fear that the Corps may be less than impartial in their renewed consideration; they may merely rationalize their prior decision, and not genuinely reconsider it.

If the Court had the discretion to remand the issue to either agency, these considerations would help guide our use of that discretion. However, under the MOU, the Corps makes wetlands determinations for all cases except special ones. Since neither the Corps or the EPA has declared the center to be a special case, the Corps has the authority to make the decision. *Id.* at ¶ 4.

In accordance with this Court's retention of jurisdiction over this case, we deem it important to ensure that the Corps' reconsideration is thorough and fair. We have

perused both the aerial photographs and staff report of Dr. Huffman commissioned by the EPA, and note that they amply support plaintiffs' assertion that the site contains wetlands. Dr. Williams, the expert who interpreted the photographs, concludes that "[t]he site was never totally dry even after the site was initially filled ... There was wetland and aquatic habitat present in every photograph since 12/13/72; therefore the habitat was never totally removed." *Aerial Photointerpretation of WetlandAquatic Habitat, and Fill Locations, Port of Oakland Distribution Center, Oakland California Study Period: 1969–1987,* at 17. Dr. William's conclusion accords with Dr. Huffman's finding that the site contains "wetlands as well as other waters" that are "subject to Section 404 regulation under the U.S. Army Corps of Engineers, San Francisco District's regulatory program." *A Report on the Presence of Wetland and Other Aquatic Habitats Within Areas of the Port of Oakland Distribution Center,* July 24, 1987, at 38.

The Court strongly suggests that the Corps carefully consider this and other evidence. If the Corps upholds its prior determination, and it becomes necessary for us to review that decision, we will certainly wish to know why these findings were rejected by the Corps. In this regard, we also suggest that the Corps make written findings, as required by the MOU, 45 Fed. Reg. at 45019, ¶ 4, which thoroughly explain the basis for its action and provide an adequate record for judicial review. Finally, we recommend that the Corps fully elicit the participation of the plaintiffs in this litigation as a means of adequately considering all points of view on this important question.

With these suggestions, we remand the determination to the Corps for what we expect will be an expeditious reconsideration. This remand temporarily disposes of plaintiffs' second cause of action, though

---

8. Contrary to plaintiffs' claim, there is no evidence that the EPA has asserted jurisdiction over the site after its withdrawal of the Findings.

we retain jurisdiction over that claim.[9]

### 4. Disposition of Remaining Issues.

#### A. Port's Dismissal Motion.

The Court will not dismiss the first cause of action against the Port. That cause of action may be justiciable if the Corps reverses itself and finds that the site contains wetlands, or if the Court finds that the site contains wetlands upon review of the Corps' decision. Therefore, we will stay the dismissal motion and retain jurisdiction over the first cause of action, pending the outcome of the Corps' review.

The third cause of action is moot. In the third cause of action, plaintiffs challenge the Corps and the EPA for failing to make a wetlands determination. Of course, the Corps did make such a determination. Even if there were technical irregularities that void the determination, the Corps will make a new wetlands determination pursuant to this remand. Therefore, the third cause of action is dismissed.

The Court will not dismiss the fourth cause of action. That claim's continued vitality depends upon the outcome of the Corps' reconsideration. Though the Port presses us to declare that the EPA's alleged failure to enforce compliance with the permit program does not state a cause of action under section 1365(a)(2), the Court need not make that determination now. Since the claim may be mooted by subsequent Corps and EPA action, the Court will not render what may be an advisory opinion on this issue. Therefore, the Court will stay the dismissal motion, pending the outcome of the Corps' decision.

#### B. Discovery.

All discovery in this action is hereby stayed pending Corps' review. The parties shall submit either joint or individual reports to the Court every sixty days beginning from the date of this Order informing us of the status of the proceedings before the Corps.

IT IS SO ORDERED.

---

9. The remand does appear to moot plaintiffs' other allegations in the second cause of action that the Corps violated procedural regulations in issuing its jurisdictional disclaimer. Therefore, these allegations are dismissed.